RAILWAY EXPRESS AGENCY, INC. *v.* GEE.

4-5398 125 S. W. 2d 802

Opinion delivered March 6, 1939.

*McRae & Tompkins* and *Bush & Bush,* for appellants.

*W. F. Denman,* for appellee.

MEHAFFY, J. This acton was instituted by appellee, Mrs. Grace Gee, against appellants, Railway Express Agency, Inc., and W. L. Hines, to recover damages for injury to Mrs. Gee. On the morning of February 24, 1938, Imon Gee, husband of appellee, had to make a business trip to Texarkana, and the appellee went with him to see Red River at Fulton while the river was at flood stage; they were in a small Ford coupe, and as they were leaving Prescott their car collided with a small truck driven by W. L. Hines, one of the appellants; neither of the cars was overturned; neither car was seriously damaged; the Gees drove away in their car, and Mrs. Gee

did not see a doctor on the trip, but the next morning her arm was bruised and swollen about three inches above the elbow. The complaint alleged that Hines was an agent of the Railway Express Agency, Inc., and that he negligently and carelessly drove the truck into and against the car in which appellee was riding, seriously, painfully and permanently injuring her right arm, shoulder, neck and face to her damage in the sum of $25,000.

It was alleged that the driver of the truck failed to keep a lookout, failed to keep his truck under control, and operated it at a high, reckless and dangerous rate of speed.

The answer of the Railway Express Agency, Inc., denied the material allegations of the complaint, and pleaded contributory negligence; and Hines also filed answer denying the material allegations and pleading contributory negligence.

There was a verdict and judgment for $5,000, and the case is here on appeal.

The evidence tended to show that on the morning of February 24, 1938, the appellee, with her husband left Prescott about 9:15 o'clock at the intersection of highway 67 and East Elm street; the evidence of appellee showed that they were crossing the street properly, on the proper side, and that the truck driven by Hines approached, and that at the time Hines was looking north over his shoulder. The truck struck the car in which appellee was riding and nearly turned it over; that Hines did not check his speed before the collision; that Hines said immediately after the collision: "I didn't see you before I hit you. I am sorry. Just as soon as I get through delivering this express I will come by the store and straighten it up." Appellee went on to Fulton, and later had the car repaired at a cost of $25.50. After the wreck, witnesses noticed in the back of Hines' truck a roll of something, looked like it might have been tires, and two boxes wrapped in brown paper; they looked like express packages. Gee did not discover that his wife was injured until while they were on the trip she complained and did not sleep any that night. The afternoon

after the collision there were two black places as big as a tea-cup on her arm; she has suffered considerably since that time; cannot do her normal housework; the injury is worse than it was a few days ago; she does part of her housework, and her husband helps her do the work; Hines was driving his car at a high, reckless and dangerous rate of speed all the time. After the collision the coupe was sitting diagonally on the highway, just across the black line in the center; the collision did not so disable the coupe as to prevent the trip, and it did not prevent the appellee from going on the trip, although she complained all the time.

The appellee's testimony showed that they slowed up when they started into the intersection, and as they slowed up to make the turn the truck hit their car. Appellee thought Hines was going to stop or turn. The Gee car was in the intersection before the Hines truck; Mr. Hines was driving a half-ton Ford truck. When they saw Hines coming appellee held her hand out, but he was looking north, and he hit the appellee's car, and appellee's car did not hit his. Appellee testified at length about the pain and suffering caused by the injury to her arm; she does her own cooking with what little assistance her husband can render; makes up her beds, but her husband does most of the housework; Hines' truck was going about 20 miles an hour; appellee was treated by Dr. Hesterly, and afterwards went to Little Rock to see Dr. McGill; her arm troubles her all the time, and she has to take tablets to make her rest; arm and shoulder are steadily growing worse.

Beverly Johnson testified that he was not looking at the cars when the collision occurred, but the Hines car hit the Gee car; the Gee car was struck about the middle of the door; there was something in the bed of Hines' truck; little boxes of some kind; witness heard Mr. Hines tell Mr. Gee as soon as he got through delivering express he would come over to see him; does not know what was in the boxes in the truck; does not know whether Mr. Gee signaled a left turn or not.

Mr. Gee testified that he did signal a left turn as he drove into the intersection.

Mrs. Emma Sampson saw the collision and stated that Gee came straight into the intersection on the right side of the street and turned south toward Hope; she saw the Hines truck coming and saw he was going to hit the Gee car; Hines was looking back over his shoulder; was driving fast, and Gee was not driving fast; the front of Hines' truck hit the center of the Gee car; Hines had something in his truck which witness took to be car casings and three or four boxes wrapped in brown paper; Hines was looking north over his left shoulder, and the car was coming as fast as he could drive.

Reece Marks testified that he saw Gee drive into the intersection; he got into the intersection before Hines did; the Gee car was hit about the center; saw some little boxes in Hines' truck; two or three of them.

Harvey Francis testified that he repaired the Gee car, and that the right door panel, the front and rear fenders and the running board were damaged, all on the right-hand side; the car had been struck about midship; the repair bill was $25.50.

Dr. J. B. Hesterly testified that he was a practicing physician and surgeon, and that Mrs. Gee came to him in February, 1938, suffering from an injury to her right arm and shoulder; the injury to the arm was just above the elbow up to the shoulder; there was a broken blood vessel; thinks she had an injury to the radial nerve; the nerve extends up into the shoulder; an injury to this nerve could cause pain where the nerve goes; witness dressed the arm; appellee complained of pain which he attributed to pressure on the radial nerve. It is possible that scar tissue was left there which is causing the present trouble; the greater the scar tissue the greater would be the pain; attributes her pain to scar tissue resulting from the hoemotoma. Dr. Hesterly further testified that Mrs. Gee was normal and healthy in every particular with the exception of her arm, and he would naturally expect her to get better; never saw any evidence of her arm being paralyzed, nor any evidence of the loss of the

functions of her arm; gave her some acetidine to make her sleep; did not think she needed morphine; did not give her any powerful sedatives; she complained some with pain around her neck, and said she felt a kernel under her arm, but she had no kernel under her arm; cannot say for sure whether she has a nerve injury; thinks she has an injury, but cannot be sure; thinks the scar tissue would pinch the nerve, and as long as the scar tissue is there she will have trouble; is still treating her, but she is a lot better; physicians have to go almost entirely on what the patient tells them, unless they are paralyzed, and there is no feeling; Mrs. Gee is not paralyzed and has feeling in her arm; as far as witness knows appellee told him the truth about her condition.

Dr. McGill testified in substance that he examined appellee and found a hard knot on her arm; she was constantly suffering pain; the examination revealed an injury to the radial nerve, a lump was there, the muscles were flabby, the strength of the arm diminished, and the arm and hand colder than the other arm; ordinarily the arm of a right-handed person is larger than the left arm; appellee's left arm is larger than the right; the lump of scar tissue is about the size of a silver dollar or larger; scar tissue never absorbs; her injury is permanent; thinks her condition will get worse; atrophy is taking place; the radial nerve is being pinched by scar tissue, and it will cause paralysis if the scar tissue contracts and pinches the nerve sufficiently; she has partial paralysis now; the right arm is a quarter of an inch smaller than the left.

Dr. Buchanan, a witness for the appellant, testified in substance that there was nothing to indicate paralysis of the arm, and there would be nothing about a bruise on her arm that would cause her ear to ache, and she complains of pain in her arm, neck and ear; could not tell that one of her arms was colder than the other; there was no flabbiness about her right arm; arms are the same size by actual measurement; a haemotoma is not a serious injury; has never known a bruise or blow on the

outside to injure radial nerve; it is most unusual to get paralysis of any nerve in the arm; there is no scar tissue in the lady's arm; if she had scar tissue her arm would be larger, not smaller; Mrs. Gee does not have the appearance of suffering great and excruciating pain; she looks well and healthy; finds no evidence of paralysis or atrophy in her arm; if one had total paralysis of the radial nerve, there would be total paralysis of the arm; if there were partial paralysis of the radial nerve there would be a partial paralysis of the arm.

The evidence introduced by appellants on the question of how the accident occurred, and whose negligence caused it, is in conflict with the evidence of appellee's witnesses.

Appellant Hines contends first that it is not shown by the evidence that the collision caused any injury to the appellee. Witnesses testified about the injury, and this question was submitted to the jury, and their finding is against the contention of the appellant.

He contends next that the court did not instruct the jury on proximate cause. Appellant Hines requested no instruction on proximate cause, but the court did, in effect, instruct the jury on this question.

Each defendant asked the court for a directed verdict, which was refused. Appellant Hines then says that the court instructed the jury orally, and sets out the oral instruction, which is quite long, and says that the court told the jury that the plaintiff claimed that she was injured, and argues that there is no evidence that Mrs. Gee was injured in the collision. We think there was ample evidence to submit this question to the jury, and its finding is conclusive here, there being substantial evidence to sustain it.

Appellant Hines next contends that there is no substantial evidence that he was acting within the scope of his employment at the time of the collision. So far as appellant Hines is concerned, if his negligence caused the injury, it is wholly immaterial what his relation was with the other appellant; but the evidence shows that immediately after the injury Hines said in the presence

of witnesses that as soon as he delivered his express he would come back and see Mr. Gee. There is sufficient evidence above set out to submit the question to the jury as to whether, at the time of the accident, Hines was acting within the scope of his employment of the express company.

The other appellant, Railway Express Agency, argues that the case should be reversed, because of the improper and prejudicial closing argument made by appellee's attorney. It then says that, in making his closing argument to the jury, the attorney for the appellee said:

"You may rest assured, gentlemen of the jury, that if any one of you, or your wife or daughter should come in here and have a case against a corporation, they will accuse you of being a liar, a perjurer and a thief." Objection was made to this argument.

The court announced that he did not hear the argument, and directed the jury to consider only the law and testimony. If the trial court did not know what the attorney said, he certainly could not reprimand him, and it was the duty of the attorney objecting to the argument to tell the court what was said. He does not claim that he did that. He does claim that the court learned what was said when the motion for new trial was filed, but, of course, that was too late for the court to admonish him. The trial was over, the jury discharged, and judgment had been rendered. But if this argument by the attorney was error, it was invited error. The attorney for appellants, in the examination of Dr. Buchanan, asked this question: "Dr. Buchanan, Mr. Denman usually uses you himself when he has got an honest injury, does he not?"

Although probably not intended as such by the attorney, this was an insinuation that this was not an honest injury. Lawyers in the heat of argument sometimes say things which they would not otherwise say. While the attorney may not have intended it, the statement could have been construed as charging what the attorney for the appellee said. In the examination of

appellee by the attorney for appellants, appellee was asked by the attorney: "You tell the jury that you think that a car struck by a car flying and hit broadside will only be knocked two feet—do you tell the jury that?" And again the attorney for appellants said, in his cross-examination of appellee: "You got your information from your attorney mainly, didn't you?" He also asked her: "How did Dr. McGill know what part of your body to make an X-ray of?" "Why did he make a picture of your right arm instead of your left foot?" This manner of examination was doubtless the cause of the statement made by appellee's attorney in his closing argument. If appellants' attorney had called attention of the court to what the attorney for appellee said, the court doubtless would have taken such steps as seemed necessary to correct the error; but certainly it would not be proper to not let the court know what the complaint was about, and then be permitted thereafter in his motion for a new trial to raise the question.

There was a verdict and judgment for $5,000. The injury, as shown by the testimony, was not a severe injury. The appellee did practically all of her work after the injury, her cooking and household work, and continued to do this, although she says her arm was getting worse. A majority of this court is of the opinion that the verdict is excessive; that is, that the evidence is insufficient to support a verdict for $5,000. This court cannot set aside a verdict simply because it thinks it is excessive, unless it can say that there is no substantial evidence to sustain a verdict of that amount.

The authorities on this question are discussed in *McCord* v. *Bailey & Mills,* 195 Ark. 862, 114 S. W. 2d 840. In that case the court said: "We have determined that the verdicts are excessive by at least a thousand dollars in each case, even though we consider the evidence in its most favorable light, for compensation for whatever injuries or losses were sustained by either. The evidence will not support a recovery in excess of $500 for each plaintiff.

"Therefore, if the appellees will enter a remittitur so as to permit a recovery by each for only $500, the judgments so reduced will be affirmed, or be entered here for that amount. If such remittitur be not entered within fifteen days judgments will be reversed and remanded on account of the error indicated."

Therefore, in this case a majority of the court, being of the opinion that there is no substantial evidence to sustain a verdict for $5,000, has reached the conclusion that the error may be corrected by permitting the appellee to enter a remittitur for $2,500. If such remittitur is entered within fifteen days, the judgment will be affirmed for the amount of the judgment, less the remittitur. If the remittitur be not filed within fifteen days, the judgment will be reversed, and the cause remanded for new trial.